### No. 11.092.

M. C. RANDALL AND WIFE VS. NEW ORLEANS AND NORTH EASTERN

RAILROAD COMPANY.

The judgment was signed on plaintiffs' motion, in order that they might exercise their right of appeal.

They did not thereby acquiesce in the judgment.

The motion to dismiss the appeal on the ground of acquiescence is overruled.

Any regulation the carrier may adopt, the effect of which would be to unjustly release him from that utmost care and diligence the law requires, is nugatory.

The conditions of a ticket may be waived by an authorized officer.

The written extension of the time to return on a ticket endorsed before it had expired will be given effect unless it is established that the extension was subject to certain conditions or contingencies.

The company had no right to eject the passenger.

Randall vs. Railroad Co.

In order that there may be a foundation for an action, the wrong and damage must be in sequence; if not in sequence the damage will not follow from the wrong, the wrong and the damage not being sufficiently conjoined as cause and effect.

Damages are allowed for the ejectment only.

As to the other causes alleged, it is rejected.

$A$PPEAL from the Civil District Court, Parish of Orleans. *Voorhies, J.*

*W. S. Benedict* and *James D. Séguin* for Plaintiffs and Appellants:

1. Every means of defence, such as payment, release, novation, etc., which goes to show the extinguishment of an obligation admitted or proved to have once existed, must be pleaded specially, and can not be urged under the general issue. New Orleans Gas Co. vs. Hudson et al., 5 R. 486; 9 R. 256; 6 L. 457; 6 An, 778; 30 An 1210; 33 An. 748.

2. Evidence to prove such special defence, not specially plead, is illegally admitted; and a charge of the court directing the jury to consider such defence and inquire into the same is improperly given. Canton vs. Torry, 8 M. 207; 3 L. 420; 9 R. 476; 14 An. 139.

3. Where the charge of the district judge is such as to have misled the jury upon the facts, or upon the legitimate scope of their inquiry into matters of fact under the pleadings, the Supreme Court will set aside the verdict and render such judgment on the appeal as evidence justifies. Moller vs. Grauche. 16 An. 43.

4. Masters and employers are answerable for the damage occasioned by their servants and overseers in the exercise of the function in which they are employed. Rev. C. C., Art. 2320 (2299).

5. In cases involving the responsibility of a common carrier, such as a railway company, all employés on the company's train are considered as its servants and employés, and their negligence, or the negligence of any one of them, is the negligence of the company. Williams vs. Pullman Palace Car Co., 40 An. 417; 102 U. S. 451; 76 N. Y. 402.

6. The failure of a railroad company to introduce the testimony of its official or employé, in whose presence the accident occurred, or under whose management the breach of contract was produced, raises a presumption of negligence against the company. Day vs. Railroad Co., 35 An. 694.

7. Under the law the measure of damages for breach of contract is at least such damages as will fully indemnify the creditor whenever the contract has been broken by the negligence of the debtor. Rev. C. C., Art. 1934 (1928), Sec. 3.

8. Indemnity for damages actually sustained should cover not only pecuniary loss and actual expense incurred, but also reparation for mortification, annoyance and vexation suffered. Byrne & Co. vs. Gardner & Co., 33 An. 6; 37 An. 881; 39 An. 963.

9. Punitory or exemplary damages, over and beyond the full limit of mere indemnity, are now recognized as allowable under the civil law of Louisiana; and this is specially true where the allowance tends, as a warning and example, to the greater safety of the public at the hands of public corporations. And to such damages common carriers are properly subjected in clear cases of gross negligence. Dirmeyer vs. O'Hern, 39 An. 963, 964; Bannon vs. Balt. & Ohio Railroad, 24 Md. 108; Id. 271; 25 Md. 378; Redfield on Railways, II, 305 (Note 2); Id. 309.

10. Under the well settled jurisprudence of the country, railroad companies are held to the greatest care and diligence both in regard to the machinery and equipments of the road, and the conduct and acts of their officers, agents and employés. Hanson vs. Railway Co., 38 An. 144; 10 An. 38; 14 How. 486; Am. and Eng. Railroad Cases, VI, 592.

11. Where two causes co-operate to produce the damage resulting from a legal injury, the proximate cause is the originating and efficient cause which sets the other cause in motion. 5 Otto 130, 131; Sherman & Redfield, 310; Sedgwick, I, p. 60 (Note 7); Ib., II, p. 862 (Note 6); Lapleine vs Railroad Co., 40 An. 661.

12. When by breach of contract or quasi contract, or by offence or quasi offence, duty is violated and injury results, the measure of damages is the injury done, even though such injury might not have resulted but for the peculiar physical condition of the person injured, or may have been aggravated thereby. Thus where the damage done to a person by wrongful ejectment from a railway train appears to be aggravated by a latent disease which had never exhibited itself before the ejectment and might never have developed but for it, the party in fault will be held for the entire damage, as the result of such wrongful ejectment. Lapleine vs. R. R. Co., supra cit.

*Harry H. Hall* for Defendant and Appellee:

1. A party litigant can not appeal from a judgment rendered upon a jury verdict when such judgment has been rendered upon the party's own motion. 6 An. 723; 15 La. 459; 33 An. 1277.

2. It is lawful for a common carrier to make with a passenger a contract limiting the former's liability. 51 N. Y. 166; 112 U. S. 331; Am. and Eng. Encyc. of Law, Vol, 2, pp. 315,318; 85 An. 15; Hutchinson on Carriers, Sec. 237.

3, So a stipulation is valid in a signed contract for carriage, by which, in consideration of a reduced fare, a passenger agreed to use his ticket within a certain specified period of time.

4 And when such contract expressly stipulates that no agent or employé of the railroad company shall have power to waive any of the conditions of said contract, an extension of said limit of time granted by a local ticket agent, after the expiration of the limit, is void.

5. When a local agent, who is applied to to extend a limited ticket, doubts his power to do so, and so informs the applicant, who voluntarily assumes the risk of ejectment, no recovery can be had of the railroad company in case of ejectment.

6. It is frivolous to aver that for a young, robust man, in perfect health, to cross a railroad platform from a warm car to a comfortable station house, a distance of thirty feet, with the temperature at 40 deg. F., is an exposure sufficient to produce death.

7. Typhoid fever can not be contracted or engendered by any degree of exposure to cold. It is a germ disease, the micro-organism of which can only take effect after introduction into the stomach and intestinal canal.

The opinion of the court was delivered by

BREAUX J. The plaintiffs sue to recover damages on account of the death of their son.

They allege that their son purchased from the defendant company a tourist ticket from Cincinnati to New Orleans and return on the 8th day of February, 1890, which expired by limitation on the 28th of February, 1890.

That he arrived in New Orleans on the 10th of February.

That his business having detained him, he obtained an extension of his ticket, from the proper officer, to the 5th March, 1890, and left on the afternoon of the 1st March, 1890, in the enjoyment of his usual good health, strength and mental vigor.

That at Slidell, a station on defendant's line, he was unjustly ejected by the conductor, in the night in freezing weather, and left in a forlorn and helpless condition in an uncomfortable place.

That whilst suffering and exposed to the inclemency of the weather a freight train of the defendant company came along, at a late hour of the same night, from the conductor of which he obtained permission to return to New Orleans, where he arrived chilled and sick from his exposure, having engendered in his system the illness of which he died.

That he was furnished by the division passenger agent, who had extended his ticket, with a letter instructing the conductor to acknowledge his extended ticket.

That without adding anything to the extended ticket which had been refused on March 1, he took passage on defendant's train for Cincinnati on the evening of March 3, 1890, and arrived at his destination on the night of the 4th March, 1890; still quite ill from the effects of the severe cold settling on his lungs, dating from this ejectment.

That he continued in the performance of his duties up to the 17th March, 1890, at which time he was forced to his room, on account of his illness contracted during his exposure to the weather and his ejectment on the night of March 1.

That the illness resulted in his death on the 30th March, 1890.

That they have been damaged by the loss of their son in the sum of $25,000.

That "he suffered injury and damage to his feelings in the pain he endured, in the expenses necessarily incurred and the necessary loss of his support during his illness, in his anxiety of mind, the great suffering he was compelled to undergo, in the sum of $25,000, and that same has of right descended to them." In its

## ANSWER,

the defendant pleads the general denial.

It admits the issuance of a ticket; that it was about to expire by limitation, and that as an act of personal consideration and favor it was extended.

That the extension not being usual and the late R. B. Randall, plaintiff's son, not identified, the conductor under his general instructions not to recognize such tickets so notified him.

That he was treated with courtesy and was provided with comfortable and free transportation back to New Orleans.

That upon his return he expressed his satisfaction at the extension of his absence from his business.

The case was tried twice before the court *a qua*. The first verdict was for plaintiff in the sum of $5000. Upon defendant's motion, alleging erroneous instruction by the court to the jury, a new trial was granted. The second verdict and judgment therein were for $1 and costs. From this judgment the plaintiffs appeal.

## THE FACTS.

The decedent's health prior to his last illness had been excellent. He was not addicted to any bad habit. He was a good son and in every respect a worthy young man. He was the holder of a ticket bought as alleged.

It was printed on his ticket that in consideration of the reduced rates at which it was sold, he agreed that it should be void at the expiration of twenty days from the time it was issued; that he would not hold the line liable for damages on account of any statement by any employés not in accordance with the contract, and that no agent had any power to alter, modify or waive any of these printed conditions.

On the 12th day of February, 1890, the general passenger agent issued instructions to the conductors not to honor tourists' and other tickets stamped across face, extending the limit.

This was followed on the 27th of the same month by a circular informing the conductors that the previous instructions, those of the 12th current, relative to tickets stamped across their face extending the limit, did not refer to those bearing indorsements made with the autographic signature stamp of the general passenger agent, but

referred to endorsements made with stamp not bearing such signature.

Young Randall's ticket was genuine. The time was extended on the 28th February by an officer duly authorized.

This officer states that he was on friendly terms with the young man, and the limit of the ticket was extended, as an act of accommodation and favor; that he informed him that it was not customary and exposed him to its refusal, for there were scalper's tickets in circulation.

The witness states that the young man said he would assume all responsibility.

That upon his return, the day after he had been ejected, he met the witness and spoke of the matter lightly, as one to which he did not attach any importance.

The officer handed him a letter addressed to the conductor, directing him to honor the ticket in question.

On the day the young man left for Cincinnati the second time, he accompanied him to the station and personally introduced him to the conductor, who became willing to honor the identical ticket he had refused on the evening of the 1st of March as being a scalper's ticket —i. e., the conductor who had said to this young man as a passenger that he could get off at Slidell, and that he would write a request to the south-bound passenger train to return him to New Orleans, and who also said to him that he believed he held a scalper's ticket.

The young man, on the night that he was ejected, remained at the station house at Slidell about an hour.

The depot agent at that place testifies that the room was comfortable; that he was with him the whole time; that he did not suffer from exposure.

The young man returned to New Orleans as a passenger in the caboose of a freight frain.

Witnesses differ in their testimony, both about the station house accommodation and that of the caboose.

The train left Slidell for New Orleans at 6:35, and made the usual time between the two places.

The young man was at his parents' home at about 10 o'clock.

It was a cold night.

He complained of chilliness.

The two days following he complained of cold and of indisposition.

Randall vs. Railroad Co.

He left New Orleans on Monday, the 3d day of March, and reported to his employer for duty on March 5.

His cold was severe; he complained of illness.

One of his employers states that a few days after his return he spoke to him at his desk; that he was suffering. He remonstrated. The young man answered he would feel better at work, particularly as his work had accumulated during his absence, and that he decidedly preferred to continue busy.

His ailment increased from day to day until the 17th of March, he left work and remained in bed to the day of his death, March 30, 1890.

Dr. J. T. Whitaker, of Cincinnati, was the first physician called.

By his testimony, and that of the other witnesses, who testified upon the subject, it is proven that the patient died of typhoid fever, and that that fever prevails in Cincinnati every fall and winter.

There were no reported cases of that disease in New Orleans or Slidell at that time.

This physician testifies that he saw the patient the first time; he took it to be at the end of the first week of the disease.

" If that be true," he adds, " he must have received the poison of the disease two weeks previously. This is the period of incubation, during which time the patient is still able to go about, at the end of which time the symptoms become so marked as to confine him to his bed."

In a letter to the father, plaintiff in this case, he states: " Your son had the disease in him when and before he started on his journey here;" *i. e.*, before he left Cincinnati for New Orleans.

" The ·patient had been in bed a day or two before I saw him."

Two other physicians gave medical attention to the deceased. Their testimony is to the same effect as that of Dr. Whitaker.

The witness above named states ¡as his opinion that the disease was contracted in the ordinary way—that is, by drinking water contaminated with typhoid poison, and that it was not the result of exposure to cold or to the weather.

Another of the attending physicians, Dr. Robert W. Stewart, testifies: When I first saw Mr. Randall he was in the second week of typhoid fever, greatly prostrated, indifferent to his surroundings, with low muttering delirium, high and continuous fever, weak and rapid pulse; in short his condition was such as to make me give a

" probably fatal " prognosis upon my second visit. I knew nothing about " exposure " until some time after his death. He had an un-. doubted attack of typhoid fever, and died of the exhaustion consequent upon this disease.

Question by plaintiffs on cross-examination. "Assuming as a fact that a young man, holding a through ticket to a point of destination designated thereon, was ejected from a passenger train of cars of defendant, and forced to remain hours at a station not lighted nor heated, and then by sufferance enabled to return to his point of departure when the thermometer was below the freezing point, and then on account of business arrangement, after having obtained such additional authority as could not be obviated by any conductor of a passenger train, proceeding on his way on the following day to Cincinnati, what would be the effect of said exposure under the circumstances upon a young man, when typhoid fever was prevalent at the point of arrival or place of his destination?"

A. " None at all. It could have no effect at all."

Dr. J. T. Davis, another attending physician, says:

"Exposure may have a tendency to make the disease more dangerous."

He does not refer to any exposure or to any symptoms establishing that, in the case, there was any evidence or symptom of exposure which acted as an aggravating cause of the disease.

Those physicians who testified as experts limited their testimony to the causes of typhoid fever, and to exposure to the weather as aiding or not the disease in its development.

All except one of the number state that it is a germ disease.

Dr. Stanford E. Chaillé states that the disease is due to special causes located in a germ.

In reference to the effect of exposure the witnesses do not greatly differ; only a few attach some importance to it as an aggravating cause, without however tracing any of the symptoms of the case to exposure of the weather.

Dr. J. B. Elliott of the exposure says:

"My opinion is he couldn't have typhoid fever unless he had the germ in him before. If he was a healthy man at the time I shouldn't think the exposure sufficient for the development of fever.

"My experience is that a man in a healthy condition is not affected by those exposures and don't, as a general rule, injure him.

50

"I repeat again that a man in perfect health that an exposure of that sort, in my opinion, would not certainly produce disease."

Q, "What would it produce?"

A. "It would have no effect whatever, in my opinion."

There is other medical testimony in the record, of which the above is a general outline.

### MOTION TO DISMISS THE APPEAL.

The date of the verdict is June 3, 1891.

It was followed by a motion for a new trial on the part of defendant.

The judgment was signed, on motion of counsel for plaintiffs, and on his producing the verdict rendered in favor of plaintiffs, on the 2d day of July, 1892.

The defendant moves to dismiss on the ground that plaintiffs have acquiesced in the judgment.

No action had been taken upon the verdict during more than a year.

The plaintiffs desired to avail themselves of their right of appeal. A right it was not possible to exercise without the judgment.

They, through counsel, moved to have it signed.

Immediately after the judgment had been signed they moved for the appeal and obtained the order of the court.

They directly applied for the signature of the judge, which they might have obtained indirectly without any question of acquiescence.

By thus applying they have not subjected themselves to a dis missal of the appeal.

Nothing shows that the purpose was to execute the judgment, to acquiesce, or to do aught save to appeal.

In N. O. City R. R. Co. vs. Crescent City R. R. Co., 33 An. 173, the appellant acquiesced in the judgment by executing it.

He took up the record to the United States Circuit Court and moved for the dissolution of the injunction in that court, and thereby acquiesced in the order removing the case to that court.

In Barnwell vs. Hosmer, 6 M. 722, the jury found the issues submitted by the defendant and on his motion the judgment was entered.

These cases, relied upon to dismiss the appeal, do not present the question of the signing of a judgment only to exercise the right of appeal.

The motion is overruled.

THE EJECTMENT FROM THE TRAIN.

There was an error committed in ejecting plaintiff's son.

With his ticket, the limit of which had been duly extended by an officer of the company, he had acquired the right of a passenger on the train of the defendant company.

Extending the limit of the ticket was a matter of business.

Favor can play no part and is of no avail to lessen defendant's responsibility.

The willingness of the young man to incur risk of passing on the ticket at the time he applied for the extension, as expressed in conversation with the agent here, is not of such a character as to change the relations of the parties. "But where a person rides free at the invitation of an agent of the carrier, although the agent has violated his duty by inviting him, yet if there is no collusion on his part with the agent to defraud the company, he is not deprived of his rights or remedies as a passenger as to injuries received through the negligence of the company." Wood, R. R. Law, p. 1039.

The written extension endorsed on the ticket was conclusive of the holder's right.

The general passenger agent issued a circular to conductors notifying them that these tickets should be honored, and that previous instructions were never intended to apply to such tickets as the one in question.

The local agent testifies that he was authorized to extend the time of return.

Not only his authority is not denied, the allegations lead to but one conclusion—*i. e.*, that he was duly authorized.

The answer of defendant admits the issuance of a round trip ticket as set forth in plaintiff's petition, and that the ticket was to expire by limitation.

Not only the defendant does not disavow the said authority of its agent, but in reality approves this act in extending the ticket before the limit had expired.

Passing over all possible differences in relation to the facts upon this point, and conceding all that the local passenger agent stated, the following propositions have arrested our attention:

1. The defendant did not in its pleadings rest any part of its defence upon any assumed responsibility of the passenger.

2. The local passenger agent was duly authorized to extend the time. The company is bound by his action.

3. The instructions did not refer to the ticket in question. It was properly stamped and endorsed.

Having reached this conclusion in matter of the expulsion, we will affirm the jury's finding of facts in this respect.

The amount of the verdict shows that it must have been limited to the ejectment.

The verdict will be amended so as to increase the damages for the ejectment exclusively.

There was nothing harsh about the ejectment, no indignity nor force. The passenger was given passage to return.

THE CAUSE OF DEATH IS NOT TRACED TO THE EJECTMENT FROM THE TRAIN.

All the experts, except one, testify that it is universally established that the cause of typhoid fever is a specific poison—a micro-organism known as the typhoid bacillus.

" The infection can be produced by the air we breathe and by the water we drink." Ziemssen, Vol. 1, p. 56.

That it is insidious in its attacks.

The course of the disease is characterized by certain stages.

There is a stage of incubation, or the period elapsing between the reception of the fever poison into the system and the special manifestation of the disease.

The evidence clearly shows that exposure will not produce typhoid fever.

That in a case infected with the typhoid poison or germ the period of incubation may be affected by accidental causes, such as exposure producing cold, pneumonia and other kindred diseases.

It may increase the predisposition, and we are led to infer that, in certain cases, it may be, that without these causes the poison would not take effect.

But it would be going too far to hold that the poison would not have taken effect in this case without the exposure, which was not great.

The attending physicians do not testify that there was the least manifestation of disease resulting from exposure, or that there was the least weakening of the system from any other cause than typhoid fever.

We will not assume that the exposure was an inciting cause, without testimony connecting the disease, in its course, with such a disease as exposure may produce, or without the least showing that exposure had a lowering effect upon the system, or predisposed him to take the disease.

If he had received the typhoid poison previous to his return to Cincinnati, the conditions on his return were not such, so far as the evidence discloses, to favor its development.

They were not "assisting causes."

The case of Lapleine vs. R. R., 40 An. 661, is relied upon by plaintiff's counsel as in point. In that case the court found that the child was struck and hurt by the lumber which fell from a running car; that up to the accident she had been a bright, intelligent, active and thoroughly healthy child.

That from the moment she was struck she became and has remained a constant invalid, seriously affected in mind and body, her nervous system shattered, subject to headaches, to attacks of nausea and vomiting, to frequent and sudden fainting or falling fits, emaciated, indisposed to physical or mental exertion, dragging her limbs in walking, and otherwise afflicted.

But for the accident, says the court, she might never have suffered from the latent constitutional taint—that is, the inheritance of hysterical diathesis, if it existed. It is very certain that the child had never exhibited the slightest symptoms of hysteria or the constitutional taint prior to the accident.

The court traced the disability to the blow she received.

The effect of a wound is generally traceable to its cause.

In the case at bar the death is traced to one cause, with which it does not appear that any other combined.

Death, caused by typhoid fever, Ziemssen says, p. 132, may occur in any stage of the disease; in cases not actually complicated it happens by far the most frequently toward the end of the third or the beginning of the fourth week; it rarely happens as early as the second week in uncomplicated cases.

(This work is highly recommended by the members of the medical profession.)

Considering that typhoid fever was prevalent at Cincinnati where the young man died; that there is no evidence that the disease was engendered at the time he was ejected from the train; that damages

must be the legitimate sequence of the wrong committed, we are forced to the conclusion that the ejectment had no real share in producing the disease or in predisposing him to receive typhoid poison.

It is therefore ordered, adjudged and decreed that the judgment appealed from be amended by increasing the amount of the judgment of the lower court from $1 to *$250* damages for the wrongful ejectment of plaintiff's son from the train, and that in every other respects the judgment is affirmed at appellee's costs.

## ON APPLICATION FOR A REHEARING.

BREAUX, J. The application for a rehearing is confined to demand for damages on account of the ejectment of plaintiff's son from the train.

The testimony does not bear out the charges of plaintiff against defendant presented in the application for a rehearing.

The statements of defendant's witnesses, not contradicted, are consistent with truth.

The relations between the local passenger agent and the young man Randall were friendly.

As a favor his request was complied with, and the return extended.

The agent expressed apprehension that it would not be honored, as there were worthless tickets in circulation that might cause his act in thus extending the ticket to be discredited.

It is not proven that the conductor was rude in examining the ticket on the train.

He, in error it is true, declined to honor the ticket.

The holder said he would return to the city and apply to the local agent.

He was offered facilities to return to New Orleans, which he accepted.

Meeting the local agent on friendly terms, the occurrence was referred to without the least reproach.

He called upon the agent socially, at his residence, the night before leaving for Cincinnati.

The next day the agent accompanied him to the depot and introduced him to the conductor of the train, upon which he returned to his home in Cincinnati.

The jury evidently concluded that an error had been committed in not honoring the passenger's ticket—not attended, however, with aggravating circumstances.

We have reached a similar conclusion.

The application for a rehearing and for a larger amount for damages caused by the ejectment is denied.

Rehearing refused.